Statement of the Case.
MONROE, C. J.
On October 11, 1919, plaintiff filed an affidavit in the district court upon which certain of the property of the defendant was taken into the possession of the sheriff under a writ of provisional'seizure, and two days later he filed a petition setting forth his claims more specifically, and praying for a writ of attachment, under which the Rayville State Bank was garnished and answered that defendant had on deposit $09.73, and had left with the bank a compress receipt for one bale of cotton for account of Oza Whitten. The claim sued on is said to have arisen out of a certain contract between the litigants, dated January 14, 1919, to the following effect, to wit:
Plaintiff agrees to sell to defendant, who accepts the transfer, a certain described tract of land, containing ICO acres, for $32,544, to be paid in installments, decreasing in amounts from $4,904, payable on December 1, 1919, to $3,340, payable December 1, 1926, and represented by promissory notes bearing interest at 8 per cent, from maturity, with 10 per cent, additional for attorney’s fees in case of suit, and as follows:
“It is further agreed that, if the said Whitten cannot make any one of the said payments at its maturity, then he is to pay rent for said tract of land, as follows: First year, $4,000; second year, $3,750 [and so on, growing less to the fourth payment, inclusive, the rental for which is fixed at $3,500, after which the following:] Each payment of rent is to be credited on the purchase price; and if the said Whitten shall, By the date of the maturity of said fourth payment, complete the payment of all notes, and interest due on said purchase price to that date, then I am to make him a full warranty deed to said tract of land, retaining mortgage and vendor’s privilege to secure payment of the remaining notes. It is specially understood that said Whitten is to make each payment in full, if he can possibly do so, and that I reserve the legal right to take legal steps to make such collections.
“Cotton and other crops may be sold each year, before the maturities, provided that the proceeds of any such sales are to be credited on any balance due on said notes, and the note for the current year. * * * Also it is understood that no standing timber is to be cut and removed from the tract herein mentioned, except when this may be necessary for the purposes of cultivation. Also that there be a line fence, half a mile long, extending between the N. W. % and the N. E. % of said section, and that I am to build, at my expense, one-half of this line fence, and said Whitten, at his expense, the other half. * * *. The said Whitten, in addition to price of [or?] rent, is to pay all taxes on said property. I am to furnish the said Whitten a horse named ‘Bess’ for farm use, and, if the payments of purchase price are made, I am to make a donation of said animal to him. But if he only pays rent for said tract, then he to to pay me $100 for said animal. Also, he is to have the use of one horse named ‘Ed’ free for one year, provided he makes payment for place, but, if rent only is paid, he is to pay $25 -rent for the use of said animal. Thus done and signed,” etc.
Defendant filed several motions and exceptions, and among them a motion to dissolve the attachment, which was sustained, and an exception of “prematurity of action” (in the form of a “motion”) in which he alleges that “it is not admitted that he cannot or will not carry out the contract for the purchase of the property, but, that, on the contrary, it is his purpose to do so, and this motion is a notice to that effect,” which exception was overruled. And plaintiff filed two supplementary petitions, in one of which, filed on December 23, 1919, he alleges that defendant has admitted his inability to pay either an installment of the purchase price of the property or the rent, and that “he now specially notifies said defendant that he will not continue said contract any further, and now notifies him that he must vacate the entire property; * * * also that this notice is intended as a preliminary movement, to be followed by proceedings in proper court to force him to vacate said premises if he does not voluntarily do so.” ■
*885 In another such petition, filed on December 3d, he alleges, in substance, that he adopts the allegations of his previous petition; that defendant has failed to comply with any of his obligations under the contract; and prays for judgment for the rent of the year 1919, with lessor’s privilege of decreeing the nullity of the contract and fixing the time within which defendant shall vacate the premises. The case was not put at issue on the merits, by the filing of the answer until Eebruary 11, 1920; after which, and a hearing, there was judgment for plaintiff for $4,125, with interest and attorney’s fees, and recognition of privilege on the property provisionally seized. Defendant has appealed, and plaintiff has answered, praying that the attachment be also maintained.
The finding of the crucial facts of the case is dependent upon the credence accorded to the testimony of the respective litigants, since, with but trifling exceptions, they alone testified concerning them; and the question of the credence to be so accorded is powerfully affected by the circumstances which corroborate the testimony of the one or the other, or conflict with it, as the case may be. The contract sued on calls for the payment of $32,544, for 160 acres of land in Richland parish, of which about 119 acres are said to be open for cultivation, which is at the average rate of over $200 an acre, or, as we understand, on the basis of $150 an acre, with the running interest included in the notes, that bear interest at S per cent, on the whole amount from maturity. Plaintiff testifies that he does not think that the land is worth that amount. He was interrogated as to the theory upon which the rental value was fixed in the contract, and he testified (the timbered land being excluded) that he figured the rental at $33.33 an acre, and further as follows:
“Q. What is the usual charge in the country for land rent — that is, cash rent — per acre? A. I think they pay all the way from $12.50 to $27.50, owing to the land. Q. Do you know any one in this parish who has paid that much for land? A. No, sir. Q. Do you know any one who has paid as much as $15 cash rent? A. No, sir; I could not name any one. * * * Q. Just explain how you arrived at the amount of $4,000 a year rent? A. That land has produced, and is expected to produce, two-thirds of a bale of cotton per acre. One hundred and nineteen acres planted in cotton, at two-thirds of a bale per acre, will produce approximately SO bales of cotton. Eighty bales of cot.ton at the price of cotton and seed at the time the trade or contract was made (say 40 cents per pound) would bring approximately $16,000. * * * Q. How many acres are in cultivation, out of the entire 400 on which you live? A. About 240, outside of new grounds that liave never been cultivated. Q. Has this entire place ever produced, since you owned it, SO bales of cotton? A. It has never all been planted in cotton; 72 bales is the most that, has been made in one year; that part of the field made two-thirds of a bale to the acre. Q. How many bales did the entire 400 acres produce in 1919? Our side of the 'field produced 13; I don’t know what Mr. Whitten’s part produced. Our side was practically drowned out; a very few acres — the uplands of our side, that is like Mr. Whitten’s — all produced two-thirds of a bale per acre. * * * Q. Then you have never made as much on the entire place as you expected Mr. Whitten to make on 119 acres. A. No, sir.”
We find no difficulty in accepting plaintiff’s testimony to the effect that $150 an acre was more than the land was worth; nor do we find any reason to question his estimate of the value of a maximum yield of cotton in a favorable year for the production of that staple and an almost unprecedented year for its sale; but it is not here alleged or shown that defendant was influenced in entering into the contract here in question by plaintiff’s views in regard to those matters. He had himself been planting cotton for many years, and he appears, in this instance, to have acted on his own judgment. Nevertheless we find it easier to believe the testimony of plaintiff to the effect that, near the end of the year, with say 10 bales of cotton, worth $1,650, in sight, whex-ewith to pay a *887 $4,000 installment on the price, or $4,000 for the rent, of the land, he declared that he did not intend to go on with the contract, than that he had any such intention. It is true that in his pleadings in October he alleged that he had that intention, and that on December 1st, acting through the clerk of court, he notified plaintiff that within about one hour he would make a tender of the amount required to pay the first installment of the price, and that he did make such tender. Plaintiff, however, answered the notification in writing, calling attention to the stipulations of the contract whereby he was bound to deliver a warranty title only after the payment of the fourth installment, to which he added the following:
“Notwithstanding the contract above referred to, and without admitting any obligation on my part-to have mortgages canceled at this time, I am willing to have the $1,000 mortgage and the $3,000 mortgage canceled in full, both of which, with interest, will amount to very near the $4,904. I am willing for Mi. Whitten to either leave the money with you until these mortgages are canceled or to leave them with any bank in this town until the cancellations are made. * * * You will understand that Mr. Whitten’s note is now at the Ouachita National Bank, in Monroe, and therefore I cannot surrender it to-day. However, I can secure the note and will do so by to-morrow, provided Mr. Whitten will leave the money with you (the clerk) or with some one of the banks in town.”
Though defendant denies it, the evidence satisfies us that he was well advised when he entered into the contract that the property was mortgaged, and his attention was particularly called to a mortgage of $5,000 (resting on the 400 acres and in favor of the American Investment Company) which had some 4 or 5 years to run, and could not be released without the consent of the mortgagee.
Plaintiff, at about the same time, testified that the only mortgage resting on the property that he could not, and would not at once have canceled on payment of the first installment of this price was that of $5,000 in favor of the Investment Company, and, further, as follows:
“Q. Should Mr. Whitten make you a tender to-day of the $4,904 without any cause [costs], are you willing that the money should be left in the control of this court until that $5,000-mortgage has been released from the property that he is to get? A. I am. Q. Are you willing, upon payment of that amount, as just indicated for the court to have full control -of those mortgages, except this $5,000 [and have them] canceled within the next 24 hours? A. Yes, sir, this afternoon; I have the notes for that purpose in my possession. Q. Are you willing, in addition to this, to put up enough in cash to pay the interest on that $5,000 up to' the 1st of March, and the difference between Mr. Whitten’s payment, $4,904, and the $5,000 principal of that mortgage? A. Yes; and cancel them this afternoon. Q. In addition to this, are you willing, upon payment of that amount— $4,904 note — to dismiss this suit, at your cost and to give Mr. Whitten a clear receipt up to-the present time? (Objection and ruling.) A. I am; yes, sir.” ,
—all of which, with Mr. Whitten’s failure to accept the offer so made, and the fact that he vacated the property without objection in January, 1920, confirms the opinion which we had otherwise formed that he had no-desire either to buy or rent the property upon the terms expressed in the contract, and is more than glad to get the whole matter off his hands, save that he would be willing to retain the proceeds of the crop of 1919, and pay nothing for the use of the land during that year.
Opinion.
[2] It seems clear that the contract sued on did not operate as a sale, in prwscnti, since it stipulates that a full warranty deed shall be executed only after the completion of the first four annual payments called for as installments of the price; but, conceding that defendant was entitled to have his payments, whether made as installments of price or rental attributed to the price, and *889 that he was disquieted in his possession, or had just reason to fear that he would he disquieted by an action of mortgage or other claim, his remedy would have been to suspend the payment of the installments until the seller restored him to possession or quieted the disturbance, unless the seller preferred to give him security; provided, however, that, if he was informed before the sale of the danger of eviction, he would not have been entitled to suspend the payment. C. C. 2557. But defendant was not disquieted in his possession, or threatened with disturbance, and he was informed prior to his entering into the contract in question that the property to which it related was burdened with mortgages, and his failure to pay the first installment of the price was not attributed to that circumstance. We therefore dismiss the question of the mortgages, and with it the alleged tender of the installment, from further consideration.
[1] The contract provides, and it is not disputed, that, in the event of the nonpayment of the first installment of the price, the relations of the parties shall be those' of lessor and lessee, with the exception that the. payments of the rental shall also be attributed to the price. In other words, plaintiff: was to become vested with the quality and rights of a lessor upon and by reason of the failure of defendant to pay that installment. Considering, then, the situation as it existed when the suit was instituted — i, e., shortly before' the first installment fell due — we find it to have been as follows: Defendant had occupied and had the use of the property for nearly a year, during which h.e had made a crop .(though a poor one) of cotton, which was being gathered and hauled off! the place, so that within a few days it would have been beyond the reach of the lessor’s privilege, and he had paid the owner of the property — whether he be called vendor or lessor — nothing. The contract declares that:
“Cotton and other crops may be sold each' year before the maturities [meaning .the maturities of the installments of price or rent] provided that the proceeds of any such sales are to be credited on any balances due on said notes and the note for the current year.”
It is evident, therefore, that it was not the intention of the contract that defendant should have free usé of the land for the year and then be permitted to sell the crop and walk off with the proceeds. Quite to the contrary; the proceeds were to be attributed to the payment of the note that would mature just after the gathering and sale of the crop.
If plaintiff acquired no. privilege on the crop by virtue of the foregoing stipulations, because he was not to acquire the status of lessor save upon and by reason of the failure of defendant to pay the first installment of the price, did he not acquire that status when defendant, in anticipation of such failure, announced that he would not or could not go on with the contract, but would gather the crop? Under the contract, he could occupy the land either as purchaser, on the installment plan, who was to acquire title on completing certain payments, or as a tenant; and, since he declared his abandonment of the intention to purchase, and yet remained on the land, can it be held that he did so in any other capacity than that of tenant? We think not, and are further of opinion that it would be wholly inadmissible to interpret the contract to mean that, by repudiating his agreement to purchase, defendant should be at liberty to withdraw from the operation of the alternative agreement to lease the only security that the contract provided for the execution of either agreement. We find no cases directly upon the point, in our own jurisprudence, but plaintiff’s counsel cite Foster v. Goodwin, 82 Ala. 384, 2 South. 895, Murphy v. Myar, 95 Ark. 32, 128 S. W. 359, Ann. Cas. 1912A, 573, Thomas v. Johnston, 78 Ark. 574, 95 S. W. *891 468, and Independent Lbr. Co. v. David, 5 Sask. Law, 1, as supporting the doctrine that “in a sale, with stipulation to pay rent on default of payment of note given on purchase price, the relation of landlord and tenant exists between the parties on default in payment of note, and has relation back to the making of the contract;”..a doctrine the soundness of which can hardly he questioned, and to which we think it may be added that one may default in the payment of such á note before its actual maturity by declaring in advance that he cannot, or will not, pay it, and that, in such case, as in the cases cited, the alternative obligation to pay rent is at once created, and relates back to the making of the contract.
It has been held by this court that—
“A contract by which a party is to pay an annual rent of 6 per cent, on 'the cost of a building, with the privilege of becoming the owner on paying the price, creates the 'relation of landlord and tenant.” Municipality No. 1 v. Gen. Council of New Orleans, 5 La. Ann. 761.
See, also, Sainet v. Duchamp, 14 La. Ann. 539.
Concluding, as we do, that plaintiff’s rights at the time of the institution of this suit were those of a lessor, it was immaterial, for the purposes of the exercise of that right, whether the rent was due or to become due, since the right to seize the property that was subject to his privilege was the same in either case, and was dependent only upon his truthfully making the affidavit required by C. P. 287, which he did. It is true that, earlier in the season, it is probable that there was an understanding that the cotton should be picked and sent off the place to be ginned and compressed, but that, 'as we take it, was based upon the further understanding that the proceeds, if and when sold, were to be accounted for as provided in the contract; and when, having removed the 4 bales, the defendant assumed the right to dispose of them without agreeing so to account, and while refusing even to let plaintiff know when, where, or at what .price he intended to sell, defendant was justified in swearing, as he did:
“That certain cotton has already been removed from said premises, but has been away less than 15 days — still belongs to the said Whitten; but petitioner verily fears and believes that he is now attempting to move and will remove said cotton out of the jurisdiction of the district court,” etc., and “that said'Whit-ten will remove from said leased premises all of the personal property and growing crops on which affiant has a lessor’s privilege,” etc.
He was not required, for the purposes of the provisional seizure, to charge intended fraud, and as to that charge, made for the purposes of the attachment, the trial judge has given defendant the benefit of the doubt, and we shall do likewise.
It is admitted that the allowances in the judgment appealed from of interest at S per cent., and 10 per cent., attorneys’ fees, are unauthorized, but plaintiff would have put himself in a bettei position to save the costs of the appeal if he had made that admission before the appeal was taken.
For the reasons thus assigned, it is ordered that the judgment appealed from be amended by striking therefrom the words and figures, “8 per cent, interest thereon from December 1, 1919; for 10 per cent, on the total of said sum, as attorneys’ fees,” ánd' substituting the words and figures, “5 per cent, interest thereon from December 1, 1919,” and, as thus amended, affirmed; the plaintiff to pay the costs of the appeal.